UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
GILBERT LIPTON,

                    Petitioner,              **REPORT AND**
                                                  **RECOMMENDATION**

         v.                               No. 21-CV-418
                                            (Kovner, J.)
                                            (Marutollo, M.J.)
E. BELL,
                    Respondent.
-----------------------------------------------------------------x

**JOSEPH A. MARUTOLLO, United States Magistrate Judge:**

    *Pro se* Petitioner Gilbert Lipton was convicted in the Supreme Court of the State of New York, Suffolk County, for burglary in the second degree and criminal possession of stolen property in the fifth degree.  Petitioner filed a writ of habeas corpus ("the Petition") as authorized by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254.  *See* Dkt. No. 1. The Honorable Rachel P. Kovner, United States District Judge, referred the Petition to the undersigned for a Report and Recommendation in accordance with 28 U.S.C. § 636(b).  *See* Order, dated December 6, 2023.

    For the reasons set forth below, the undersigned respectfully recommends that the Court deny the Petition.

## I.    <u>Background</u>

    Petitioner's arrest and conviction stems from the following set of facts, which "are taken from the state court record, viewed in the light most favorable to the prosecution." *James v. Doldo*, No. 20-CV-280 (RPK) (LB), 2022 WL 3030388, at *1 (E.D.N.Y. Aug. 1, 2022) (citing *Cavazos*

*v. Smith*, 565 U.S. 1, 7 (2011) (*per curiam*) and *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (*per curiam*)).

On May 14, 2014, at 7:30 a.m., Suffolk County Police Department (SCPD) crossing guard Eugenia Colaianni reported to her post at the Canaan Elementary School, located on the corner of Old North Ocean Avenue and Traction Boulevard in Patchogue, New York. *See* Dkt. No. 7-9 at 50-52, 66-67; *see also* Dkt. No. 7-1 at 66.[1]

Between 8:30 a.m. and 8:45 a.m. on May 14, 2014, Ms. Colaianni observed a white male—whom she described as "thin" and wearing black, a beige jacket, and a Mets baseball cap—riding a bicycle in her vicinity. *See* Dkt. No. 7-9 at 53-54. Ms. Colaianni observed the man "walk[] down about two houses down and then he crossed the street and walked down a driveway" of a residence that was the home of Ms. Judy Blumenthal, Mr. Ken Blumenthal, and their 24-year old daughter, Sara ("the Blumenthal Home"). *Id.* at 55, 108. Ms. Colaianni then lost sight of the man. *See Id.* at 56.

At approximately 9:15 a.m. on May 14, 2014, Ms. Colaianni observed the same man coming out of the driveway at the Blumenthal Home on his bicycle, dragging a cooler behind him. *See id.* Ms. Colaianni observed that the cooler appeared to be heavy. *See* Dkt. No. 7-9 at 57, 74. Ms. Colaianni then observed the man dismount his bicycle to "walk it" and pull the cooler because "the weight or whatever was in the [cooler] was holding him back from riding [the bicycle]." *Id.* Ms. Colaianni saw the man turn left, at which point she lost sight of him again. *Id.* at 57-58.

At approximately 11:08 a.m. on May 14, 2014, Ms. Judy Blumenthal returned home where she noticed that her screen door was ajar and that her fence gate was open. *See* Dkt. No. 7-9 at 109-111. She noted that the screen door "is always closed because we don't use it" and "the fence

---

[1] Record citations are to the page numbers shown in the State Court Record on the Court's ECF Docket, unless otherwise indicated. *See* Dkt. No. 7.

gate was open," even though "it never is" open. *Id*. Ms. Blumenthal then noticed that a window over her kitchen sink was broken, and glass was shattered over her sink. *Id*. At approximately 11:12 a.m., Ms. Blumenthal called 9-1-1 to report the break-in from her kitchen phone. *See* Dkt. No. 7-9 at 78, 112.

At approximately 11:33 a.m. on May 14, 2014, SCPD Patrol Officer James Caporale arrived at the Blumenthal Home in response to the 9-1-1 call. *See* Dkt. No. 7-9 at 78-79. Ms. Blumenthal directed the officer to the back of her home, through the back gate, where Officer Caporale observed a broken kitchen window and a broken latch to the backyard shed. *Id*. at 80. Ms. Blumenthal followed Officer Caporale into the master bedroom of the Blumenthal Home. *Id*. at 81. The master bedroom appeared to have been "ransacked." *Id*. at 82. Drawers were open with their contents strewn about the floor. *Id*. Ms. Blumenthal observed that her safe was also missing from the master closet. *Id*. at 114. Officer Caporale and Ms. Blumenthal exited the house, and Officer Caporale secured the scene to preserve the evidence in the home. *Id*. at 83.

At approximately 12:04 p.m. on May 14, 2014, SCPD Patrol Officer David Kolesar arrived at the Blumenthal Home. *Id*. at 90. Shortly thereafter, SCPD Detectives Evan Wines and Adam Friedlander arrived at the scene, and Officer Kolesar relayed the details of the burglary to them. *Id*. at 92; Dkt. No. 7-11 at 56. When Ms. Blumenthal directed the detectives to the master bedroom, she again reported that her safe was missing, along with the jewelry from her jewelry box. Dkt. No. 7-9 at 114-115.

At approximately 3:00 p.m. on May 14, 2014, Officer Kolesar spoke with Ms. Colaianni at her post; Ms. Colaianni described what she observed earlier that morning. *Id*. at 69, 93. Detectives Wines and Friedlander then spoke with an additional SCPD crossing guard, Ms. Rustmann, and two other individuals, Michelle Pulici and Maureen Taft. *See* Dkt. No. 7-11 at 66-

3

67.  Each individual "gave, basically, the exact same description of the person and circumstances surrounding it" as Ms. Colaianni had relayed.  *Id.* at 67.  Ms. Taft noted to the detectives that she had surveillance video in her home.  *Id.*  The detectives then accompanied Ms. Taft to her home and observed her surveillance video in her garage.  *Id.* at 67-68.  According to Detective Friedlander, the video surveillance showed a man "walking down the road, past her house, and he was carrying like a cart behind him."  *Id.* at 69.  After viewing the video, the detectives encountered another witness, Andrew Rella, who relayed the same description of the man as the other witnesses.  *Id.* at 70-71.

After speaking to the witnesses, the detectives surveyed the area to see "if there was anywhere" that the perpetrator "could potentially dump a safe" or other items related to a burglary.  *See* Dkt. No. 7-11 at 71-72.  The detectives noticed that there was a dumpster adjacent to a nearby auto-body shop.  *Id.*  The dumpster sat between the auto-body shop and a residence.  *Id.* at 72.

The detectives subsequently checked the dumpster to "see if there was any potential evidence" related to the burglary.  *Id.* at 73.  In the dumpster, the detectives found a safe.  *Id.*  The safe was photographed and recovered from a dumpster "several feet away from the door" of the residence.  *See* Dkt. No. 7-1 at 64; Dkt. No. 7-11 at 73.

At approximately 3:45 p.m. on May 14, 2014, Detectives Friedlander and Wines went to the residence.  *See* Dkt. No. 7-11 at 74-75.  Petitioner answered the door and identified himself.  *Id.* at 75.  Detectives Friedlander and Wines informed Petitioner "that they wanted to talk to him about certain items, among them a safe, that had been found in the dumpster immediately outside his home" following a burglary.  *See* Dkt. No. 7-1 at 64.  Petitioner "denied having any knowledge about the safe that was found in the dumpster, and said he did not know anything about the burglary."  *Id.*  Petitioner answered the detectives' questions but "seemed very nervous."  *See* Dkt.

No. 7-11 at 76.  The detectives asked Petitioner "if he 'didn't mind corning back to the precinct'[;] [Petitioner] agreed and accompanied the detectives willingly."  *See* Dkt. No. 7-1 at 64.

Petitioner was transported to the SCPD Fifth Precinct without handcuffs.  *Id.*  The detectives interviewed Petitioner at the Fifth Precinct and showed him photographs of the safe.  *Id.*  The detectives provided Petitioner with his *Miranda* rights.  *Id.*; *see also* Dkt. No. 7-2 at 361 (displaying Petitioner's signed initials on the *Miranda* card).  Petitioner again denied any knowledge of the safe.  *See* Dkt. No. 7-1 at 64.

 At approximately 6:07 p.m. on May 14, 2014, Petitioner said that it was "OK" for the SCPD to search Petitioner's apartment.  Dkt. No. 7-1 at 65.  Petitioner also asked if he could "go with" the detectives to his home; in response, Detective Friedlander said that "he didn't think it would be a good idea [a]nd that was it."  Dkt. No. 7-4 at 77.  Petitioner then signed a Permission to Search form, whereby Petitioner affirmed that, "having been informed of [his] constitutional right not to have a search made of [his] person, premises, motor vehicle, or other personal property without a search warrant, and having been informed of [his] right to refuse to consent to such a search, and understanding that evidence and/or contraband found as a result of such a search may be seized and used against [him] in a Court of Law," Petitioner authorized the SCPD to "conduct a complete search of" his "premises, and all [his] property found therein."  *See* Dkt. No. 7-2 at 347.  Petitioner affixed his signature to the document, underneath the following language: "I am giving this written permission voluntarily and without threats or promises of any kind."  *Id.*; *see also* Dkt. No. 7-11 at 79-81.  Detectives Friedlander and Wines then left the SCPD Fifth Precinct; Petitioner remained alone in the interview room, still not handcuffed.  *See* Dkt. No. 7-4 at 37-38.

At about 6:30 p.m. on May 14, 2014, after obtaining Petitioner's consent to search his apartment, Detectives Friedlander and Wines returned to Petitioner's apartment.  *See* Dkt. No. 7-

1 at 65. The detectives searched Petitioner's apartment recovered several items of evidence, including jewelry; paint chips on the floor; a screwdriver and hammer; and two Mets baseball caps under which they found two silver bars as well as coins. *Id.*; Dkt. No. 7-2 at 186; Dkt. No. 7-11 at 82-86. The detectives collected and photographed the evidence. *See* Dkt. No. 7-11 at 86.

When the detectives returned to the Fifth Precinct from their search, Petitioner was placed under arrest. *Id.*; *see also* Dkt. No. 7-2 at 83. Petitioner was charged with burglary in the second degree in violation of N.Y. Penal Law 140.25(02) and criminal possession of stolen property in the fifth degree in violation of N.Y. Penal Law 165.40. *See* Dkt. No. 7-1 at 31-32.

At 8:00 p.m. on May 14, 2014, Detective Friedlander and Detective Wines met with Ms. Judy Blumenthal. *See* Dkt. No. 7-2 at 339. Ms. Blumenthal voluntarily provided a statement to the detectives in which she outlined the items stolen from her home, including her safe, "two silver bars, coins[,] and a lot of our jewelry." *Id.*

At 9:45 p.m. on May 14, 2014, Detective Wines met with Ms. Colaianni. *See* Dkt. No. 7-1 at 66. Ms. Colaianni voluntarily provided a statement to Suffolk County Detective Wines. *See* Dkt. No. 7-1 at 54. Ms. Colaianni told Detective Wines that on the morning of May 14, 2014, she saw a man "go up the driveway at" the Blumenthal Home. *Id.* Ms. Colaianni stated that the man was riding a bicycle and "pulling a blue cooler on wheels with a red handle"; "there was a large object in the cooler that was covered with a beige jacket or blanket." *Id.* Ms. Colaianni described the man as a "white guy [] wearing all black clothes, and he had a black 'Mets' cap on"; "[h]e looked to be about 40-50 years old." *Id.*; *see also* Dkt. No. 7-2 at 338.

Detective Wines asked Ms. Colaianni to view a photo array. *See* Dkt. No. 7-1 at 66-67. "Detective Wines created the photo array through the use of an SCPD computer program"; "[t]he photo array was created by entering sought-after identification search parameters relative to this

case into a computer." *Id.* at 66. "The parameters specified a white male, 55 years old, plus or minus 2 years." *Id.* Over 100 photographs were returned by the computer search. *Id.* Detective Wines reviewed all 100 photographs and then selected the photographs that he determined most resembled Petitioner. *Id.* Detective Wines noted that he made the selection based on his own observations of Petitioner, not based on Ms. Colaianni's description. *Id.* Petitioner's photograph was included in the array that was presented to Ms. Colaianni." *Id.* Detective Wines chose five photographs that would accompany Petitioner's photograph in the array. *Id.* While Detective Wines chose which photographs were selected, "the computer randomly assigned the positions of the photos in the array." *Id.* "The positions can be changed manually, but usually are left alone, as was done with this photo array." *Id.*

Detective Wines read the following instructions to Ms. Colaianni prior to showing her the computer-generated photo array:

> You will be asked to look at a group of photographs. The fact that the photos are shown to you should not influence your judgment in any way. You should not conclude or guess that the photographs contain the picture of the person who committed the crime merely because you are being shown these photographs. Keep in mind hair styles, beards and mustache are easily changed. Please do not indicate to other witnesses that you have or have not made an identification.

> As part of the ongoing investigation into a crime that occurred on (date) at (location) you will view a photo array. It consists of six photographs of individuals. Each photograph has a number underneath the photograph. Take whatever time you want to view the photo array. The perpetrator may or may not be among the pictures. Do not assume that I know who the perpetrator is. Do not look to me or anyone else in the room for guidance during the procedure. Individuals presented in the photo array may not appear exactly as they did on the date of the incident because features, such as head and facial hair, are subject to change. Photographs may not always depict the true complexion of a person; it may be lighter or darker than shown in the photo. Pay no attention to any markings that may appear on the photos or any other difference in the type or style of the photographs. Do not discuss with other witnesses what you see, say or do during this procedure. After you have had an opportunity to view the photo array[,] I will ask you the following three questions: Do you recognize anyone? If you do, what is the number of the

person you recognize?  From where do you recognize the person? I may ask you follow up questions.

Dkt. No. 7-1 at 66.

Detective Wines told Ms. Colaianni that the "suspect may or may not be" in the photographic array and that "the police did know who the perpetrator was." *See* Dkt. No. 7-1 at 67.  Detective Wines did not present Ms. Colaianni with the photo array until he was satisfied that she understood all of the instructions. *Id.*

Ms. Colaianni "recognized the man in photo number 1 as the same guy [that she] saw this morning riding a bike dragging the cooler"; the man was later identified to her as Petitioner. *See* Dkt. No. 7-1 at 55-56; *see also* Dkt. No. 7-2 at 336.  Ms. Colaianni ultimately circled a photograph of Petitioner as part of the photo array.  *See* Dkt. No. 7-1 at 55; *see also id.* at 56-58 and 67.  According to SCPD, Ms. Colaianni identified Petitioner "[i]n less than one minute." *See* Dkt. No. 7-1 at 67.

On May 19, 2014, Petitioner's sister, Elaine Comeau, went to Petitioner's apartment to retrieve certain items that she had given him earlier to help set up his apartment.  *See* Dkt. No. 7-2 at 107.  While retrieving those items, Ms. Comeau found jewelry in towels in a step stool at Petitioner's apartment and "immediately took [the jewelry] to the police department in Patchogue." *Id.*; *see also* Dkt. No. 7-2 at 372.

Also on May 19, 2014, at 11:30 a.m., Ms. Christine Galloway[2] met with Detective Friedlander.  *See* Dkt. No. 7-2 at 341.  Ms. Galloway noted that on Wednesday, May 14, 2014, at 8 a.m., she was at work when she observed "a grown man, older, like 5'7", thin, white" walking with a "blue kid's type cart." *Id.*  Ms. Galloway observed the man "pulling [the cart] behind him."

---

[2] Ms. Galloway's surname appears to have been improperly stated as "Gallo" on her SCPD Statement Form. *See* Dkt. No. 7-2 at 341.

*Id.* Ms. Galloway noted that she observed the man go into his home, change clothes, and then watched him carry "a big box with a blanket on it to the dumpster between [her] shop and his home." *Id.* Ms. Galloway then observed the man "turn the blue cart inside the dumpster" and the man returned inside to his apartment. *Id.*

On May 23, 2014, a Suffolk County grand jury indicted Petitioner for burglary in the second degree and criminal possession of stolen property in the fifth degree. *See* Dkt. No. 7-2 at 138-42. On the same date, the trial court (Cohen, J.) issued an order of protection against Petitioner; ordering him to, *inter alia*, stay away from Mr. and Mrs. Blumenthal. *See* Dkt. No. 7-1 at 11.

On May 28, 2014, Petitioner moved to "dismiss the indictment §210.30(1)(2) of the Criminal Procedure Law, based upon insufficiency of the evidence presented to the Grand Jury and/or the insufficient legal instruction given to the Grand Jury by the prosecutor." *See* Dkt. No. 7-1 at 24.

On May 29, 2014, Ms. Blumenthal provided a sworn statement to the SCPD regarding the stolen jewelry from her home. *See* Dkt. No. 7-1 at 44. She identified the jewelry retrieved from Petitioner's apartment as belonging to her. *See* Dkt. No. 7-2 at 117.

On June 23, 2014, the trial court issued an order that, *inter alia*, denied Petitioner's motion to dismiss the indictment, finding that "the District Attorney's instructions on the law to the Grand Jury [] were not defective as a matter of law." *See* Dkt. No. 7-1 at 22.

On September 8, 2014, the trial court held a suppression and *Wade* hearing. *See* Dkt. No. 7-4. The trial court considered whether Petitioner's consent to search his apartment was voluntary and assessed the procedure for the photo array utilized with Ms. Colaianni. *See* Dkt. No. 7-4 at 2. Both Detectives Friedlander and Wines testified at the September 8, 2014 hearing. *Id.* at 4-83.

Detective Wines explained that when preparing the photo array for Ms. Colaianni, the detectives relied on a computer program whereby they used Petitioner's "photo that was already in the system" and then they "put in search parameters." *See* Dkt. No. 7-4 at 52. Based on those parameters, the computer program "will return as many photos that they have in the system that match that criteria." *Id.* Detective Wines searched for "a white male, fifty-five years of age, plus or minus two years." *Id.* When the computer "returns with a list of photographs," Detective Wines selected the photographs that he felt "look similar to" to Petitioner. *Id.* at 52, 62. A total of six photographs were included in the array. *Id.* at 53. Detective Wines testified that "[t]he computer randomly places the photographs where it wants, in whatever position." *Id.* Detective Wines testified that the six-photo array was shown to Ms. Colaianni and that she selected Petitioner. *Id.* at 53-60.

On October 10, 2014, the trial court denied Petitioner's motion to suppress the physical evidence seized by the SCPD, as he found that the search was based on consent and was lawful. *See* Dkt. No. 7-1 at 63-68. The trial court also determined that the "identification of [Petitioner] in the photo array was not unduly suggestive." *Id.*; *see also* Dkt. No. 7-2 at 81-86.

On December 1, 2014, the trial court held a *Sandoval* and *Antommarchi* hearing. *See* Dkt. No. 7-5. The People sought to impeach Petitioner regarding the following prior convictions: his Attempted Burglary in the Second Degree conviction in 2003 and his 2001 Burglary in the Second Degree charge, which was dismissed in satisfaction of that conviction; a 1998 conviction for Attempted Burglary it the Second Degree; a 1992 conviction for Burglary in the Second Degree; a 1983 conviction for Burglary in the Third Degree; a 1980 conviction for Burglary in the Third Degree; and a 1977 youthful offender adjudication for Burglary in the Third Degree. *See* Dkt. No. 7-5 at 4-6. The trial court ruled in favor of a *Sandoval* compromise, precluding the prosecution

from eliciting the underlying facts of Petitioner's convictions in order to avoid any undue prejudice, but allowing the People to inquire, should he testify, if he had in fact been convicted of these felonies. *Id.* at 5-8. The trial court also held that he was satisfied that he was voluntarily, knowingly, and intelligently waiving his right to be present at all stages of the trial proceedings, including sidebar conferences, and accepted his signed *Antommarchi* waiver. *Id.* at 9-11.

Petitioner's trial occurred between January 7, 2015 and January 20, 2015. *See* Dkt. Nos. 7-2 through 7-14. Petitioner did not testify. *See* Dkt. No. 7-13 at 86 (Petitioner's counsel noting that Petitioner "has advised me [that] he does not wish to testify. And after consultation with him and others in conducting an investigation, we rest at this time.").

On January 20, 2015, a jury convicted Petitioner of the offenses of Burglary in the Second Degree, N.Y.P.L. §140.25(2), a class "C" felony, and Criminal Possession of Stolen Property in the Fifth Degree, N.Y.P.L. §165.40, a class "A" misdemeanor. *See* Dkt. No. 7-1 at 119; Dkt. No. 7-2 at 24-25; Dkt. No. 7-14 at 84-85.

On January 26, 2015, the prosecution informed the trial court that Petitioner "has previously been subjected to two or more predicate violent· felony convictions as defined in P.L. §70.04(1)(b), and the sentence upon the prior convictions was imposed before commission of the present felony; to wit, [Petitioner], in the County Court of Suffolk County, State of New York, on the 13th day of February, 1998, was convicted of the crime of Attempted Burglary in the Second Degree, which occurred on or about October 30, 1997, and on the 13th day of February, 1998, was thereafter sentenced to 5 years' incarceration; and in the County Court of Suffolk County, State of New York, on the 7th day of November, 2003, was convicted of the crime of Attempted Burglary in the Second Degree, which occurred on or about April 30, 2002, and on the 22nd day of

December, 2003, was thereafter sentenced to 12 years to life incarceration." *See* Dkt. No. 7-1 at 121.

On March 4, 2015, Petitioner was sentenced to 20 years to life on the burglary conviction and 1 year on the criminal possession of stolen property conviction. *See* Dkt. No. 7-1 at 119. Petitioner filed a notice of appeal on the same date. *See* Dkt. No. 7-1 at 128; *see also* Dkt. No. 7-1 at 154.

On February 1, 2016, Petitioner moved, pursuant to C.P.L. §440.20, in the County Court of Suffolk County (Mazzei, J.) to set aside his sentence. *See* Dkt. No. 7-2 at 25. On February 23, 2016, the County Court of Suffolk County denied Petitioner's motion. *Id.*

On October 15, 2018, Petitioner again moved in in the Supreme Court of the State of New York, County of Suffolk (Ambro, J.), pursuant to C.P.L. §§ 440.10 and 440.20, to vacate his judgments of conviction or, in the alternative, to set aside his sentence. *See* Dkt. No. 7-2 at 25. On January 15, 2019, that court denied Petitioner's motion. *Id.*

On June 27, 2018, the Appellate Division, Second Department affirmed petitioner's conviction. *See People v. Lipton*, 162 A.D.3d 1070 (App. Div. 2018); *see also* Dkt. No. 7-2 at 210-11. The Appellate Division affirmed that "[c]ontrary to [Petitioner's] contention, the County Court's determination that his consent to the search of his apartment was voluntarily given and was not the product of coercion was supported by the evidence at the suppression hearing." *See Lipton*, 162 A.D. 3d at 1071. The Appellate Division therefore agreed "with the County Court's determination to deny that branch of [Petitioner's] motion which was to suppress physical evidence obtained from the search of his apartment." *Id.* (citations omitted).

The Appellate Division also affirmed "the [trial court] determination to deny that branch of [Petitioner's] motion which was to suppress identification testimony," as "[t]he evidence

adduced at the *Wade* hearing [] established that the pretrial identification procedures were not unduly suggestive, as the persons depicted in the computer-arranged photographic arrays were sufficiently similar in appearance to [Petitioner]." *Id.* (citations omitted).

Further, the Appellate Division affirmed that the trial court's "*Sandoval* ruling [] was an appropriate exercise of discretion," as "[t]he extent to which the prosecution should be allowed to impeach the credibility of a defendant is a matter that is generally left to the sound discretion of the trial court." *Id.* (citations omitted). The Appellate Division reasoned that the "*Sandoval* ruling permitting the People to inquire as to whether [Petitioner] had been convicted of four felonies, but precluding any questioning about the underlying facts of those prior crimes, avoided any undue prejudice to [Petitioner] and constituted a provident exercise of the court's discretion." *Id.* (citations omitted). The Appellate Division added that "[u]pon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence." *Id.* at 1072. (citations omitted).

The Appellate Division also noted that "[t]he sentence imposed was not excessive." *Id.* (citing *People v. Suitte*, 90 A.D.2d 80 (1982)).

On September 21, 2018, the New York Court of Appeals denied Petitioner leave to appeal. *See People v. Lipton*, 32 N.Y. 3d 1005 (2018) (denying application in criminal case for leave to appeal) (DiFiore, Ch. J.); *see also* Dkt. No. 7-2 at 25. Petitioner's conviction became final ninety days later, on December 20, 2018. *See* Dkt. No. 5 at 18-9.

On March 22, 2019, Petitioner moved, in the Supreme Court of the State of New York, County of Suffolk, pursuant to C.P.L.R. §§1101 and 1102, for an order waiving costs for the production of, *inter alia*, trial transcripts and trial exhibits for the purpose of preparing "any possible" C.P.L. §440 motions, a writ of *error coram nobis*, and/or Federal Habeas Corpus

petitions.  *See* Dkt. No. 7-2 at 25.  In the alternative, Petitioner sought a reduction of the costs of these documents and exhibits.  *Id.*  On May 2, 2019, the prosecution opposed his motion and on that date, this Court denied Petitioner's motion without prejudice.  *Id.*

On June 14, 2019, Petitioner moved, in the Supreme Court of the State of New York, County of Suffolk, pursuant to C.P.L. § 440.10(1)(h), "to vacate his judgments of conviction, claiming that trial counsel was ineffective by not allowing him to testify at his pre-trial hearing, by not requesting a *Mapp/Dunaway* hearing, and by failing to investigate whether his sister [Ms. Comeau]—who was called by the People at trial and treated as a hostile witness—was acting as an agent of the Suffolk County Police during the pendency of his case."  *See* Dkt. No. 7-2 at 26; *see also* Dkt. No. 7-2 at 40-41 (showing date of submission of June 14, 2019).[3]  On August 19, 2019, the Supreme Court of the State of New York, County of Suffolk, denied Petitioner's motion. *Id.*; *see also* Dkt. No. 7-2 at 38-9.

On August 28, 2019, Petitioner sought leave to appeal the August 19, 2019 decision to the Appellate Division, Second Department, pursuant to C.P.L. §§ 450.15 and 460.15.  *See* Dkt. No. 7-2 at 26.  The Appellate Division, Second Department, denied leave to appeal on December 12, 2019.  *See People v. Lipton*, 2019 WL 6767271, 2019 N.Y. Slip Op. 85919(U) (N.Y. App. Div. Dec. 12, 2019); *see* Dkt. No. 7-3 at 222.

On January 21, 2021, Petitioner filed his petition for a writ of habeas corpus in the present action.  *See* Dkt. No. 1.  Petitioner raised four grounds on which he requests action by this Court, to wit: (1) Petitioner's "consent to search his apartment was not knowing, intelligent[,] and voluntary"; (2) the "[p]hoto-array identification by [the] People's witness [was] unduly suggestive and subsequent in[-]court identification should not be admitted"; (3) the Court "abused its

---

[3] Ms. Comeau's testimony is set forth at Dkt. No. 7-2 at 105-114.

discretion by permitting the People to question [Petitioner] about his prior conviction if he chose to testify"; and (4) Petitioner's "sentence was harsh and excessive." *Id.* at 6-13. Respondent filed its opposition on December 2, 2021. *See* Dkt. No. 5.

## II.   Legal Standards

### A.   The AEDPA

"[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Rather, "28 U.S.C. § 2254 allows a court to entertain a habeas petition 'only on the ground that [an individual] is in custody in violation of the Constitution or laws or treaties of the United States.'" *Garner v. Lee*, 908 F.3d 845, 860 (2d Cir. 2018) (quoting 28 U.S.C. § 2254(a)). "The [AEDPA] provides that 'a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treatises of the United States.'" *Barnette v. Superintendent of E. Corr. Facility*, No. 21-CV-2596 (RPK) (LB), 2022 WL 21828598, at *4 (E.D.N.Y. Nov. 16, 2022), *report and recommendation adopted*, 2023 WL 8622835 (E.D.N.Y. Dec. 13, 2023) (citing 28 U.S.C. § 2254(a)).

Under the AEDPA, the scope of federal review of a claim depends on whether the claim was "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *see Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009). If the claim was adjudicated on the merits by a state court, the district court may grant the habeas application only if the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

A state court's decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's result. *Bell v. Cone*, 543 U.S. 447, 452-53 (2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court's decision "involved an unreasonable application of" Supreme Court precedent if there is "no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 100, 102 (2011).

A determination that a state decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), requires more than that a federal court conducting habeas review "would have reached a different conclusion in the first instance," *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (internal quotation omitted). "[I]f reasonable minds reviewing the record might disagree about the finding in question, on habeas relief, that does not suffice to supersede the trial court's determination." *Id.* at 314 (brackets, ellipses, and internal quotation omitted). But state court findings "might represent an 'unreasonable determination of the facts' where, for example, reasonable minds could not disagree that the trial court misapprehended or misstated material aspects of the record in making its finding, or where the court ignored highly probative and material evidence." *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013) (internal citation and quotations omitted). A federal habeas court may only "issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

These standards are "intentionally difficult to meet," *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quotations omitted) (citing *White v. Woodall*, 572 U.S. 415, 418 (2014)), because federal habeas review is "a 'guard against extreme malfunctions in the state criminal justice systems,' " rather than "a means of error correction," *Greene v. Fisher*, 565 U.S. 34, 43 (2011) (quoting *Harrington*, 562 U.S. at 102-03).

Under the AEDPA, as long as a state court adjudicated a litigant's claim on the merits, a federal court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (internal quotation marks omitted).

As with all *pro se* submissions, habeas submissions by a *pro se* litigant are "construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quotations omitted).

### B.    Statute of Limitations

Pursuant to the AEDPA, a one-year statute of limitations applies to petitions for writs of habeas corpus brought by state prisoners. 28 U.S.C. § 2244(d). The AEDPA provides, in relevant part:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of [:] (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States

is removed, if the applicant was prevented from filing by such State action; (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Thus, the AEDPA requires that habeas petitions challenging state court judgments be filed within one year of the date that a judgment becomes final. *Id.*

"A judgment becomes final 'after the denial of certiorari by the U.S. Supreme Court or the expiration of time for seeking *certiorari*.'" *Davis v. Lempke*, 767 F. App'x 151, 152 (2d Cir. 2019) (alteration accepted) (quoting *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001)); *see also Bobbitt v. Martuscello*, No. 23-CV-04909 (DG), 2023 WL 8372892, at *1-2 (E.D.N.Y. Dec. 4, 2023) ("When a petitioner does not file a petition for certiorari seeking review in the United States Supreme Court, a state court conviction becomes final 90 days after the Court of Appeals either denies the petitioner's application for leave to appeal or affirms the conviction.") (citing *McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003)).

The one-year statute of limitations period, however, is statutorily tolled during the periods of time in which the properly filed applications for state post-conviction relief are pending. *See* 28 U.S.C. § 2244(d)(2); *Bennett v. Artuz*, 199 F.3d 116, 118-19 (2d Cir. 1999), *aff'd*, 531 U.S. 4 (2000); *see also Santos v. Keyser*, No. 21-CV-2859, 2022 WL 1092678, at *2 (E.D.N.Y. Apr. 12, 2022) ("The one-year statute of limitations period under AEDPA is statutorily tolled while 'a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending.'") (citing 28 U.S.C. § 2244(d)(2)). "However, for the one-year period to be statutorily tolled, the post-conviction or other collateral petition must be filed within the one-year period; a post-conviction motion does not revive or extend an already expired statute of limitations period under AEDPA." *Santos*, 2022 WL 1092678, at *2 (citing *Evans v.*

18

*Senkowski*, 228 F. Supp. 2d 254, 260 (E.D.N.Y. 2002) and *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)).  The tolling provision serves only to exclude "time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run."  *Smith*, 208 F.3d at 17 (2d Cir. 2000).  A state habeas petition is not "properly filed" under 28 U.S.C. § 2244(d)(2) if the petition does not satisfy N.Y. C.P.L.R. 7002.  *See Santana v. Griffin*, No. 17-CV-03827 (PAE) (KHP), 2018 WL 1229860, at *4-5 (S.D.N.Y. Mar. 7, 2018).

The one-year limitations period "is also subject to equitable (versus statutory) tolling, which may be applied when a petitioner has shown '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'"  *Santos*, 2022 WL 1092678, at *2 (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).  The AEDPA's one-year statute of limitations, however, may be equitably tolled "only in 'rare and exceptional circumstances.'"  *Perez v. Johnson*, No. 21-CV-3061 (RPK), 2023 WL 4405656, at *4 (E.D.N.Y. July 7, 2023) (quoting *Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011).  "To succeed on a claim for equitable tolling, "a petitioner [must] demonstrate[ ] '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'"  *Harper*, 648 F.3d at 136 (quoting *Holland*, 560 U.S. at 649 (2010)) (citation and quotation marks omitted).

The first prong requires a petitioner to "show diligent pursuit of his claim '*throughout the period he seeks to toll*.'"  *Harper*, 648 F.3d at 139 (quoting *Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007)) (emphasis in *Harper*).  "As for the second prong, a petitioner must 'demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing.'"  *Perez*, 2023 WL 4405656, at *4 (quoting *Valverde v.*

*Stinson*, 224 F.3d 129, 134 (2d Cir. 2000)). "The two prongs are related: extraordinary circumstances cannot be said to have prevented timely filing [and] if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Perez*, 2023 WL 4405656, at *4 (citations and quotation marks omitted). "The term 'extraordinary' does not refer to the uniqueness of the petitioner's circumstances, 'but rather how severe an obstacle it is for the prisoner endeavoring to comply with AEDPA's limitations period.'" *Bolarinwa v. Williams*, 593 F.3d 226, 231-32 (2d Cir. 2010) (quoting *Diaz v. Kelly*, 515 F.3d 149, 152 (2d Cir. 2008)). "Sufficiently 'severe' obstacles have included extraordinary attorney misconduct, the petitioner's mental illness or hospitalization, prolonged delay by a state court in sending notice of a ruling, and intentional obstruction by prison officials of an inmate's ability to file his petition." *Bobbitt*, 2023 WL 8372892, at *2 (quotation omitted).

"[A] litigant who seeks equitable tolling based on extraordinary circumstances and who establishes causation is required to show reasonable diligence in pursuing his claim throughout the period he seeks to have tolled." *Harper*, 648 F.3d at 134. "Once tolling ends and the limitations clock resumes, a § 2254 petition is timely as long as it is filed before the total untolled time exceeds one year." *Id.*

## III.   Discussion

### A.    The Petition is Untimely and Not Subject to Tolling

Here, the petition is untimely because it was filed outside of the AEDPA's statute of limitations as set forth in 28 U.S.C. 2244(d)(1). Petitioner was denied leave to appeal on September 21, 2018. *See Lipton*, 32 N.Y. 3d 1005. Petitioner's conviction became final ninety

days later, on December 20, 2018,[4] when the time to seek a writ of certiorari from the United States Supreme Court expired. *See Fernandez v. Artuz*, 402 F.3d 111, 112 (2d Cir. 2005). Since Petitioner failed to file his petition by that date, the Petition is time-barred.

Liberally construed, Petitioner contends that his "CPL 440 motions" toll the statute of limitations and render his petition timely. *See* Dkt. No. 1 at 14; *see also* Dkt. No. 7-2 at 25. As noted above, Petitioner brought a motion for post judgment relief under N.Y. Criminal Procedure Law §440.10 on June 14, 2019. *See* Dkt. No. 7-2 at 40-41. The Supreme Court of the State of New York, County of Suffolk, denied this motion on August 19, 2019. *Id.* Petitioner then sought leave to appeal this decision on August 28, 2019. *Id.* The Appellate Division, Second Department, denied leave to appeal on December 12, 2019. *See People v. Lipton*, 2019 WL 6767271, 2019 N.Y. Slip Op. 85919(U) (N.Y. App. Div. Dec. 12, 2019); *see* Dkt. No. 7-3 at 222.

The duration of time in which a properly filed application for State post-conviction or other collateral review is pending is not counted toward the statute of limitations. *See* 28 U.S.C. 2244(d)(2); *see Smith*, 208 F.3d at 17 ("We . . . hold that proper calculation of Section 2244(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run."); see also *Davis v. Lempke*, 767 F. App'x 151, 152-53 (2d Cir. 2019). A petitioner's N.Y.C.P.L. § 440.10 motion does not "reset the date from which the one-year statute of limitations b[egan] to run." *Smith*, 208 F.3d at 17 ("[i]f the one-year period began anew when the state court denied collateral relief, then state prisoners could extend or manipulate the deadline for federal habeas review by filing additional petitions in state court.").

---

[4] Respondent contends that the conviction became "final on or about December 21, 2018, 90 days after the Court of Appeals denied leave on September 21, 2018." Dkt. No. 5 at 18-19. But regardless of whether the conviction became final on December 20, 2018 or December 21, 2018, the Petition is time-barred.

Here, a 181-day period—between June 14, 2019, when Petitioner filed his motion for post-judgment relief, and December 12, 2019, when the Appellate Division, Second Department, denied that motion—was tolled.  But even with this period tolled, Petitioner's application is still untimely, since he did not file his Petition until January 21, 2021.  *See* Dkt. No. 1.  Moreover, Petitioner has not demonstrated that he was pursuing his rights diligently or that any extraordinary circumstance stood in his way.  *Cf. Perez*, 2023 WL 4405656, at *5 ("In sum, even if petitioner faced extraordinary circumstances due to the COVID-19 pandemic, petitioner's failure to describe any step he took toward preparing his application during the relevant period means the link of causation between the extraordinary circumstances and the failure to file is broken, and equitable tolling is not warranted.") (citations and quotation marks omitted).

Accordingly, the undersigned respectfully recommends that Petitioner is not entitled to statutory or equitable tolling and the Petition be denied on these grounds alone.

## B.    Petitioner's Claims Fail on the Merits

But even if Petitioner's claims were timely, Petitioner's claims fail on the merits.  Petitioner has not demonstrated that the Appellate Division's decision affirming his convictions was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

### 1.    Petitioner's Fourth Amendment Claim Fails

Petitioner first asserts that his "consent to search his apartment was not knowing, intelligent and voluntary."  *See* Dkt. No. 1 at 6.  Petitioner argues that the "consent to search apartment was obtained after [Petitioner] was taken into custody where he was advised that going back to his

apartment to allow officers to search his apartment was 'a bad idea'"; Petitioner argues that "had

he been asked at the time, he was at his apartment his consent could be considered voluntarily and

knowingly given, instead he was taken away from his domicile and tricked into allowing officers

to search his ap[a]rtment with no objections as to what they would be allowed to search and what

not to search." *Id.*

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth

Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground

that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone*

*v. Powell*, 428 U.S. 465, 494 (1976).  The Supreme Court has reasoned that, in the habeas context,

"the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is

minimal, and the substantial societal costs of application of the rule persist with special force." *Id.*

at 494-95; *see also Huertas v. Annucci,* No. 23-cv-2371 (BMC), 2023 WL 3687962, at *3

(E.D.N.Y. May 26, 2023) (noting that courts within the Second Circuit "have almost uniformly

held that challenges to a state court's rulings as to the application of the exclusionary rule are not

reviewable under *Stone*.") (collecting cases).

The Second Circuit limits habeas review of a state prisoner's Fourth Amendment claims to

two narrow situations: "(a) if the state has provided no corrective procedures at all to redress the

alleged Fourth Amendment violations; or (b) if the state has provided a corrective mechanism, but

the defendant was precluded from using that mechanism because of an unconscionable breakdown

in the underlying process." *Barnette*, 2022 WL 21828598, at *5 (citing *Capellan v. Riley*, 975

F.2d 67, 70 (2d Cir. 1992) and *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977)).  "Whether

a habeas petition will be dismissed under *Stone* does not depend on the merits of the underlying

Fourth Amendment claim, but on whether the petitioner had a full and fair opportunity to litigate

the claim in state court." *Ethridge v. Bell*, 49 F.4th 674, 684 (2d Cir. 2022). "In other words, a determination that *Stone* precludes a petitioner from obtaining habeas relief on his Fourth Amendment claim is not an adjudication on the merits of that claim, but, rather, an application of a prudential rule akin to a procedural bar." *Id.*

*Stone* is dispositive here, as Petitioner has fully litigated his Fourth Amendment suppression claims in state court. *Barnette*, 2022 WL 21828598, at *5. Following the September 8, 2014 evidentiary hearing, the trial court addressed this issue in its October 10, 2014 decision. *See* Dkt. No. 7-1 at 63-68. Petitioner "was informed both verbally and in writing of the language on the form itself, including that he had the constitutional right to refuse to give his consent." *Id.* at 65. Petitioner "gave his written authorization to search voluntarily, even though Detective Friedman again told him that he did have the right to refuse giving his consent to search."[5] At that point, Petitioner's only request was asking if he could accompany the detectives back to his apartment during the search; Detective Friedman said that he did not think that it was a "good idea." *See id.* As the trial court noted, "[t]here was no indication at any time that [Petitioner] rescinded or wished to rescind his consent to the search." *Id.* Petitioner raised this issue on appeal, and the Appellate Division, Second Department affirmed the decision. *See Lipton*, 162 A.D. 3d at 1071. The Appellate Division noted that, "[c]ontrary to [Petitioner's] contention, the [trial court's] determination that his consent to the search of his apartment was voluntarily given and was not the product of coercion was supported by the evidence at the suppression hearing." *Id.* The Appellate Division therefore agreed "with the [trial court's] determination to deny that branch of [Petitioner's] motion which was to suppress physical evidence obtained from the search of his apartment." *Id*. (citations omitted).

---

[5] Notably, Petitioner recognized that Detective Friedman had written the wrong address on the written authorization form. *See* Dkt. No. 7-1 at 65. At Petitioner's suggestion, Detective Friedman made the correction, changing the written-to the correct and both Petitioner and Detective Friedman then initialed this correction. *See id.*

Thus, "the record reveals that at every stage of the state proceedings, [the petitioner] was afforded an ample opportunity to vindicate his Fourth Amendment rights." *Singh v. Miller*, 104 F. App'x 770, 772 (2d Cir. 2004); *see also Huertas*, 2023 WL 3687962, at *3 ("there can be no question that the state court had adequate remedies to address alleged Fourth Amendment violations and that petitioner in fact fully utilized those remedies" as he had "an evidentiary hearing and obtained appellate review of the trial court's ruling denying suppression.").

Accordingly, the undersigned respectfully recommends denying Petitioner's claim that his Fourth Amendment rights were violated.

### 2.    Petitioner's Photo Array Claim Fails

Petitioner claims that the "[p]hoto-array identification by [the] People's witness [was] unduly suggestive," thereby "giving rise to a very substantially likelihood of irreparable misidentification." Dkt. No. 1 at 7. Petitioner's claim is rooted in the trial court's decision holding that the identification of Petitioner in the photo array was not unduly suggestive. *See* Dkt. No. 7-2 at 86.

Here, following a hearing on September 8, 2014, the trial court evaluated the photo array utilized with Ms. Colaianni and determined that the "identification of [Petitioner] in the photo array was not unduly suggestive." *Id.*; *see also* Dkt. No. 7-4. The decision to deny Petitioner's motion to suppress the photo array and Ms. Colaianni's identification was on the merits and therefore, is entitled to AEDPA deference. *See Serrano v. Royce*, No. 20-CV-6660 (PMH) (JCM), 2023 WL 9418661, at *9 (S.D.N.Y. Dec. 20, 2023), *report and recommendation adopted*, 2024 WL 295374 (S.D.N.Y. Jan. 25, 2024) ("As a threshold matter, the trial court's decision to deny Petitioner's motion was a ruling on the merits and, thus, is entitled to AEDPA deference" (citing 28 U.S.C. § 2254(d)(1)-(2)).

The scope of that deference is explained in the Supreme Court's ruling in *Harrison v. Richter*, 562 U.S. 86, 102 (2011), where the Supreme Court held that under the AEDPA, deference "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings," but only allows a writ to be issued "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents." The Court must then "determine whether the state court's decision constituted an unreasonable application of clearly established federal law" or an "unreasonable determination of the facts in light of the evidence." *Brisco v. Ercole*, 565 F.3d 80, 87-88 (2d Cir. 2009).

"In order to evaluate whether out-of-court identification procedures were constitutionally permissible, a court must first determine 'whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator.'" *Mitchell v. Lempke*, No. 10-CV-1696 (JG), 2010 WL 3937306, at *6 (E.D.N.Y. Oct. 4, 2010) (quoting *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001)); *see also Simmons v. United States*, 390 U.S. 377, 384 (1968).

"To determine whether a photo array is unduly suggestive, the Court must consider 'whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit.'" *Serrano*, 2023 WL 9418661, at *9 (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990) (internal quotation marks omitted)). "If the procedures were unduly suggestive, then the court must determine whether the witness's identification was independently reliable." *Serrano*, 2023 WL 9418661 at *9 (citation omitted).

As set forth by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), independent reliability requires five factors including: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness'

prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." The list, however, is not exhaustive and "the question of independent reliability must be assessed in light of the totality of the circumstances." *Serrano*, 2023 WL 9418661 at *9 (citation omitted). Even if the witness's identification was not independently reliable, the trial court's decision to permit the witness to testify still may not warrant habeas relief, as "[t]he Second Circuit has held that an improper identification procedure may be harmless error if the weight of the other evidence would still substantially support the conviction." *Walker v. Brown*, No. 08-CV-1254 (BMC), 2009 WL 2030618, at *6 (E.D.N.Y. July 10, 2009).

Here, the photo array was not unduly suggestive. The detectives relied on an SCPD computer program that created a photo array "by entering sought-after identification search parameters relative to this case into a computer." *See* Dkt. No. 7-1 at 66. "The parameters specified a white male, 55 years old, plus or minus 2 years." *Id.*; *see also* Dkt. No. 7-4 at 52. Detective Wines reviewed the 100 photographs that were returned by the computer search and then selected the photographs that he determined most resembled Petitioner. *Id.* Detective Wines made the selection based on his own observations of Petitioner, not based on Ms. Colaianni's description. *Id.* The photographs were "randomly assigned" by the computer program. *Id.* Detective Wines instructed Ms. Colaianni, *inter alia*, that she "should not conclude or guess that the photographs contain the picture of the person who committed the crime merely because [she was] being shown these photographs." *Id.* Detective Wines told Ms. Colaianni that the "suspect may or may not be" in the photographic array and that "the police did know who the perpetrator was." *Id.* at 67. Detective Wines did not present Ms. Colaianni with the photo array until he was satisfied that she understood all of the instructions. *Id.* The six-photo array was shown to Ms.

Colaianni and she selected Petitioner.  Dkt. No. 7-4 at 53-60.  Ms. Colaianni identified Petitioner "[i]n less than one minute."  Dkt. No. 7-1 at 67.

Because Petitioner's placement in the array "would hardly suggest to an identifying witness that [petitioner] was more likely to be the culprit," the identification procedure was not unduly suggestive.  *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1984); *see also United States v. Washington*, No. 05-CRR-558 (NG), 2006 WL 3359060, at *2 (E.D.N.Y. 2006) (finding that because the members of a photo array were of similar age, complexion, hair, and eye color the procedure was not unduly suggestive).  An inquiry into independent reliability is therefore unnecessary.  *See Sims v. Sullivan,* 867 F.2d 142, 145 (2d Cir. 1989).  The identification and subsequent admission of the in-court identification was not contrary to clearly established Federal law or based on an unreasonable determination of the facts on record.

But even if the Court undertook an inquiry into independent reliability, Ms. Colaianni's identification of Petitioner was still independently reliable under the factors established in *Biggers*.  Specifically, Ms. Colaianni observed Petitioner riding a bicycle in her vicinity immediately before the accident.  *See* Dkt. No. 7-9 at 53-54.  Ms. Colaianni then observed Petitioner "walk[] down about two houses down and then he crossed the street and walked down a driveway" of the Blumenthal Home.  *Id.* at 55, 108.  Ms. Colaianni then observed Petitioner exit the driveway of the Blumenthal Home on his bicycle, dragging a cooler behind him.  *Id.*  Ms. Colaianni observed that the cooler appeared to be heavy.  Dkt. No. 7-9 at 57, 74.  Ms. Colaianni then observed the man dismount his bicycle to "walk it" and pull the cooler because "the weight or whatever was in the [cooler] was holding him back from riding [the bicycle]."  *Id*.  At bottom, Ms. Colaianni viewed Petitioner at or around the time of the crime, offered an accurate description of him to police, and

provided certainty about her selection of Petitioner at a photo array—which occurred on the same night in which she observed Petitioner entering and exiting driveway to the Blumenthal Home.

Thus, the *Bigger* factors here support the independent reliability of Ms. Colaianni's identification of Petitioner in the photo array and subsequently at trial. *See, e.g., Parker v. Lee*, 1:18-cv-10400 (GBD) (SDA), 2020 WL 13568020, at *8 (S.D.N.Y. Mar. 11, 2020) (holding that a witness's identification was independently reliable where he had seen the perpetrator previously and was "was absolutely certain that the person" in the photo was the same individual) (internal quotation omitted), *report and recommendation adopted*, 2022 WL 7164257 (S.D.N.Y. Sept. 29, 2022).

Accordingly, the undersigned respectfully recommends denying Petitioner's claim that his rights were violated when the trial court allowed a witness to testify to her previous identification of him from an allegedly unduly suggestive photo array.

### 3.    Petitioner's Claim regarding his Prior Conviction Fails

Petitioner claims that the trial court "abused its discretion by permitting the People to question [Petitioner] about his prior conviction if he chose to testify." Dkt. No. 1. Petitioner argued that "[t]he determination by the court to permit cross-examination as to the existence of these prior felonies represents an abuse of discretion under the [*Sandoval*] factors." *Id.* at 9.

Petitioner, however, must have testified to preserve the claim of improper impeachment with a prior conviction for review. Petitioner here decided not to testify. *See* Dkt. No. 7-13 at 86 (Petitioner's counsel noting that Petitioner "has advised me [that] he does not wish to testify."). "Because petitioner chose not to testify, this claim is not amenable to review under federal habeas corpus law." *Huertas*, 2023 WL 3687962, at *5.

In *Luce v. United States*, 469 U.S. 38, 43 (1984), "the Supreme Court held that 'a defendant must testify' to 'raise and preserve for review the claim of improper impeachment with a prior conviction.'" *Huertas*, 2023 WL 3687962, at *5 (citing *Luce*, 469 U.S. at 43). "A reviewing court 'cannot assume that the adverse ruling motivated a defendant's decision not to testify,' the Court explained, for 'an accused's decision whether to testify seldom turns on the resolution of one factor.'" *Id.* (citing *Luce*, 469 U.S. at 42). "Accordingly, when a defendant does not testify, any harm flowing from the pretrial ruling is 'wholly speculative,' and harmless error review becomes impossible." *Id.* (citing *Luce*, 469 U.S. at 41).

"Although *Luce* involved direct review of a federal district court's interpretation of the Federal Rules of Evidence, courts have extended *Luce*'s holding to other contexts, including habeas review." *Id.* (citing *Mercado v. Phillips*, No. 04-cv-2204, 2011 WL 1157617, at *6 (S.D.N.Y. Feb. 22, 2011) (collecting cases), *report and recommendation adopted*, 2011 WL 1157570 (S.D.N.Y. March 29, 2011). "Indeed, district courts in the Second Circuit have followed 'a bright-line rule . . . barring habeas relief for allegedly erroneous Sandoval rulings in instances where a defendant elects not [to] testify.'" *Huertas*, 2023 WL 3687962, at *5 (quoting *Shannon v. Senkowski*, No. 00-cv-2865, 2000 WL 1683448, at *6 (S.D.N.Y. Nov. 9, 2000).

Since Petitioner chose not to testify, *Luce* bars habeas review of the *Sandoval* ruling allowing the prosecution to cross-examine Petitioner about prior convictions should he have testified at trial. *See Mullins v. Graham*, No. 17-CV-2958, 2023 WL 2740774, at *6 (E.D.N.Y. Mar. 31, 2023) ("As a threshold matter, this *Sandoval* claim is not cognizable on habeas review because Mullins did not testify at trial. The Supreme Court has held that a defendant must testify to raise and preserve a claim of improper impeachment with a prior conviction.") (Chin, C.J.); *Huertas*, 2023 WL 3687962, at *5 ("Habeas corpus review does not apply to hypothetical

situations that may have occurred but for state court rulings. The need to measure prejudice cannot be satisfied by comparing testimony that petitioner never gave to the hearing court's ruling about what might have happened if he did."); *Mullins*, 2023 WL 2740774, at *6 ("Mullins's failure to testify is fatal to his claim because, without his testimony, 'any possible harm flowing from a district court's [ ] ruling permitting impeachment by a prior conviction is wholly speculative.'") (quoting *Luce*, 469 U.S. at 43).

Accordingly, the undersigned respectfully recommends denying Petitioner's claim that his rights were violated when the trial court permitted the prosecution to question Petitioner about his prior conviction if he chose to testify.

### 4. Petitioner's Harsh and Excessive Sentence Claim Fails

Finally, Petitioner argues that his "sentence was harsh and excessive" because "[p]rior to [the] suppression hearing[,] a please offer (on [the] record) was offered on May 21, 2014 of fifteen years to life on a reduced charge of attempted burglary in the sec[o]nd degree, which was rejected by [Petitioner] and maintained his innocence." Dkt. No. 1 at 10. Whether construed as arising under state law or under the Eighth Amendment, this claim does not supply a basis for habeas relief.

"New York law authorizes the appellate division to reduce a defendant's sentence '[a]s a matter of discretion in the interest of justice,' such as when the court determines that '[the] sentence, though legal, was unduly harsh or severe.'" *Santiago v. Shanley*, No. 20-CV-3530 (RPK), 2023 WL 3321665, at *3 (E.D.N.Y. May 8, 2023) (quoting N.Y. Crim. Proc. Law § 470.15(3)(c) and § 470.15(6)(b)). "But 'a claim for a reduction in sentence pursuant to § 470.15 does not, without more, raise a federal constitutional issue and is therefore not cognizable on habeas review.'" *Santiago*, 2023 WL 3321665, at *3 (citing *Bonilla v. Lee*, 35 F. Supp. 3d 551,

572 (S.D.N.Y. 2014)); *see, e.g., Ponder v. Conway*, 748 F. Supp. 2d 183, 197–98 (W.D.N.Y. 2010) (dismissing a reduction-of-sentence claim "as not cognizable on habeas review" because "[a]t most, [petitioner] has asserted a violation of New York state statutory law"); *Jones v. Artus*, 615 F. Supp. 2d 77, 87 (W.D.N.Y. 2009) (rejecting a habeas claim based on Section 470.15(6)(b) because "[t]he assertion that a sentencing judge abused his or her discretion in sentencing is ordinarily not a cognizable federal claim subject to review by a habeas court").

Petitioner raised his excessive sentence claim on appeal, and the Appellate Division, Second Department, evaluated the court's determination and found that his sentence of 20 years as a persistent and violent felony offender was not harsh and excessive. *See Lipton*, 162 A.D.3d at 1072; New York Penal Law § 70.02(1)(b), 70.08; New York Criminal Procedure Law § 400.16. Because the Appellate Division was within its discretion to reject Petitioner's argument on appeal, Petitioner's renewed reduction-of-sentence claim under state law is therefore denied.

To the extent the petition can be read to contend that petitioner's sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment, such a claim is procedurally barred. *See Santiago*, 2023 WL 3321665, at *3. On direct appeal, Petitioner presented his claim in terms of N.Y. Criminal Law, § 470.15(6) by arguing that the court's sentencing decision was "inappropriate" based on "considerations of deterrence, rehabilitation, retribution, and isolation." *See* Dkt. No. 7-2 at 203. "Because Petitioner 'did not claim his sentence deprived him of any federal constitutional right' on direct appeal in state court, he has 'failed to exhaust the remedies available in state court" with respect to any claim under the Eighth Amendment, and so the 'court[ ] need not consider the claim.'" *Santiago*, 2023 WL 3321665, at *3 (citing *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)).

In any event, "there is no Supreme Court case that has ever found a sentence to be in violation of the Eighth Amendment merely because of its length." *Santiago*, 2023 WL 3321665, at *3 (citing *Bridges v. Lee*, No. 15-CV-4669 (MKB) (CLP), 2019 WL 11816536, at *12 (E.D.N.Y. Aug. 26, 2019), *report and recommendation adopted*, No. 15-CV-4669 (BMC), 2021 WL 688292 (E.D.N.Y. Feb. 23, 2021) (internal citations omitted)); *Carmona v. Ward*, 576 F.2d 405, 408 (2d Cir. 1978) ("[the Supreme] Court has never found a sentence imposed in a criminal case violative of the Eighth Amendment merely because of its length"). Petitioner therefore cannot succeed in showing that, in upholding his 20-year sentence, the Appellate Division rendered a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d).

Accordingly, the undersigned respectfully recommends denying Petitioner's claim regarding his allegedly unreasonable sentence.

## IV. <u>Conclusion</u>

Accordingly, the undersigned respectfully recommends that the Court deny Petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254. As Petitioner has not made a substantial showing of the denial of any constitutional right, no certificate of appealability should be issued. *See* 28 U.S.C. § 2253; *see Lozada v. United States*, 107 F.3d 1011, 1017 (2d Cir. 1997), *abrogated on other grounds by United States v. Perez*, 129 F.3d 255, 259-260 (2d Cir. 1997) (discussing the standard for issuing a certificate for appealability). It is further recommended that for purposes of an appeal *in forma pauperis*, the Court should certify pursuant to 28 U.S.C. § 1915(a) that any appeal from a judgment denying this petition would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438 (1962).

Respondent shall serve a copy of this Report and Recommendation by overnight mail and first-class mail to Petitioner.  Respondent shall file proof of service on ECF by February 13, 2024.

Any objections to this Report and Recommendation must be filed within 14 days after service of this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  *See also* Fed. R. Civ. P. 6(a) & (d) (addressing computation of days).  Any requests for an extension of time for filing objections must be directed to Judge Kovner.  Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010); *Kotlyarsky v. United States Dep't of Just.*, No. 22-2750, 2023 WL 7648618 (2d Cir. Nov. 15, 2023); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated: Brooklyn, New York
       February 12, 2024

                                   */s/ Joseph A. Marutollo*
                                   JOSEPH A. MARUTOLLO
                                   United States Magistrate Judge